**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF LOUISIANA**


DARROW L. BAKER                          CIVIL ACTION

VERSUS                                   NO. 06-2039

BURL CAIN, WARDEN                        SECTION "A"(5)


### REPORT AND RECOMMENDATION

This matter was referred to the United States Magistrate Judge for the purpose of conducting hearings, including an evidentiary hearing, if necessary, and submission of proposed findings and recommendations for disposition pursuant to 28 U.S.C. §636(b)(1)(B) and (C), and as applicable, Rule 8(b) of the Rules Governing Section 2254 Cases. Upon review of the entire record, the court has determined that this matter can be disposed of without an evidentiary hearing. See 28 U.S.C. §2254(e)(2). Accordingly;

IT IS HEREBY RECOMMENDED that the instant petition be **DENIED WITH PREJUDICE.**

## I.  PROCEDURAL HISTORY[1]

Petitioner, Darrow Baker, is a state prisoner currently incarcerated in the Louisiana State Penitentiary, Angola, Louisiana.  On July 9, 1998, petitioner was charged by bill of indictment with first degree murder in violation of La. R.S. 14:30(A)(6).  Petitioner pled not guilty.  After a hearing, the trial court found probable cause to bind petitioner over for trial and denied his motions for an in camera inspection of the State's file, to suppress the identification, and to quash the death penalty.  Defense counsel requested a lunacy hearing, and on May 25, 1999, Mr. Baker was found to be competent to stand trial.  His first trial, on September 21, 1999, resulted in a hung jury.  After a two-day trial on April 10-11, 2000, a twelve-person jury found Mr. Baker guilty of second degree murder.  On April 27, 2000, the trial court sentenced petitioner to life imprisonment without the benefit of parole, probation or suspension of sentence.

On November 7, 2001, the Louisiana Fourth Circuit Court of Appeal affirmed petitioner's conviction and sentence.  State v. Baker, 800 So.2d 453, No. 2000-KA-1763 (La. App. 4 Cir. 2000) (unpublished decision).  On January 10, 2003, the Louisiana Supreme Court denied petitioner's writ application.  State v. Baker, 834

---

[1]Portions of the procedural history are taken from the Louisiana Fourth Circuit Court of Appeal's decision on direct appeal, State v. Baker, 800 S.2d 453, No. 2000-KA-1763 (La. App. 4 Cir. 2001) (unpublished decision).  A copy of the state appellate court's unpublished opinion is contained in the State rec., vol. 1 of 4.

So.2d 436 (La. 2003).

Following the completion of his direct appeal proceedings, petitioner sought post-conviction relief.   On June 30, 2004, Orleans Parish District Court Judge Dennis Waldron denied petitioner post-conviction relief.[2]   On September 2, 2004, the Louisiana Fourth Circuit Court of Appeal, finding "no error in the judgment of the district court denying relator's application for post-conviction relief", denied petitioner's writ application.[3] Finally, on June 24, 2005, the Louisiana Supreme Court denied petitioner's writ application, thereby bringing his state post-conviction proceedings to an end.   State ex rel. Baker v. State, 904 So.2d 738 (La. 2005).

In the instant federal habeas corpus action, petitioner raises the following claims: 1) Evidence was insufficient to support his second degree murder conviction; 2) The method employed under La.C.Cr.P. art. 413(C) to choose the foreperson for the grand jury which indicted him was unconstitutional; 3) He was denied his constitutional right to testify; 4) His constitutional rights were violated as a result of the jury instruction provided with respect to "reasonable doubt"; 5)His constitutional right to present a defense and to effective assistance of counsel was violated.   In

---

[2]A copy of Judge Waldron's Judgment is contained in the State rec., vol. 3 of 4.

[3]A copy of the state appellate court's decision is contained in the State rec., vol. 3 of 4.

its Response, the State concedes that the instant action is timely and that petitioner, as required under <u>Rose v. Lundy</u>, 455 U.S. 509, 102 S. Ct. 1198, 71 L. Ed. 2d 379 (1982), has exhausted his state court remedies.  Before proceeding to the merits, the court shall review the applicable facts.[4]

Ms. Sheryl Woods testified that on January 11, 1998, she was employed by the New Orleans Parks and Parkway Department, and at about 8 a.m. she was directing traffic for a tree-trimming crew working in the St. Thomas housing development.  While the crew was working, a chain saw was stolen, and the police were called.  Ms. Woods approached a group of young men standing nearby and informed them that the police had been called to the scene, informing that "if they had anything on them, that it was best that they should leave." The group, which included petitioner, Darrow Baker, left, but they came back while the police were still there and were ultimately questioned by police with respect to the missing chain saw.  Ms. Woods testified that she had seen the person who stole the chain saw and that it was not petitioner.

When the police left, the park crew returned to trimming trees, and Ms. Woods resumed her position directing traffic. Because traffic was light, Ms. Woods was, in her own words, just

---

[4]The facts are taken from the Louisiana Fourth Circuit Court of Appeal's unpublished opinion, <u>State v. Baker</u>, 800 So.2d 453, No. 2000-KA-1763 (La. App. 4 Cir. 2001), as well as from information gleaned from the court's review of the trial transcript.

"standing around being nosy."  She observed a white car driven by a white man pass by, then go down a driveway and return.  There was a younger man who was a passenger in the car.  She then saw Mr. Baker approach the car and speak to the two men.  At this point, the passenger got out of the car and stood for a few minutes with his left foot inside, holding onto the door.  The passenger next walked to the front of the car near the hood; he was still on the passenger side, and Mr. Baker was standing across the hood on the driver's side.  A shot rang out, the car pulled off, and more shots were heard.  Ms. Woods said she heard at least three shots in only a few seconds.  She was standing behind the gunman, and she saw that he was wearing a Devil's sports jacket, a pair of black jeans and red Bally shoes.  She had noticed these clothes earlier that day on Mr. Baker, when the entire crew had commented on the "spiffy" outfit he was wearing so early in the morning.  After the shooting, the gunman walked back toward Ms. Woods, tossed his gun under a building, turned around and walked towards the housing development.  She then realized he was the same person she had warned earlier about the arrival of the police.

Before the police arrived to investigate the shooting, a boy about ten years of age, who had been on the corner all morning, went over to the building and appeared to pick up the gun.  Ms. Woods assumed that was what he did because she saw him go to the site where the gun had been thrown and then run; she did not

actually see the gun in his hands, however.  When Ms. Woods walked up to the victim, later identified as William White, she saw that he had a handful of little pebbles, which she thought to be rock cocaine.  The people in the area took the rocks.  When asked if she knew what the shooting was about, Ms. Woods said, over the defense's objection, that she had heard the white man say to Mr. Baker that "he didn't want it."  After that, the passenger got out of the car and Ms. Woods heard Mr. Baker and the passenger "fussing," but she could not understand what they were saying. When the police officers who were there earlier returned to the site, Ms. Woods told them that the shooter was one of the persons they had questioned earlier in connection with the theft of the chain saw.

Sometime later, New Orleans Police Detective David Gaines came to Ms. Woods' place of employment and showed her two photographic lineups.  She selected Mr. Baker's picture from the second lineup and wrote "tentative ID" on the back of the picture.  At trial, Ms. Woods explained that she wrote those words not because she was uncertain about the identification, but rather, because she was not sure she wanted to be involved in the investigation.[5]  After she appeared before the grand jury, Detective Gaines told her that

---

[5]Ms. Woods explained that her hesitancy to get involved was based, in part, upon the fact that her nephew had recently been killed.  By way of further explanation, Ms. Woods queried:  "[W]hen you have a shooting in the project...who does want to be involved?"

Crimestoppers was offering a $1,000 reward for information concerning the murder. Ms. Woods took the money, but insisted that she did not testify for the $1,000 reward.

Dr. Alvaro Hunt, an expert forensic pathologist, testified that he performed the autopsy on William White on January 12, 1998. Mr. White died while in surgery as a result of one of two gunshot wounds. The fatal bullet pierced his body from left to right. It entered his left side about eight inches below his armpit and went through his left kidney and spleen and also through the first lumbar vertebrae on his backbone. From there the bullet traveled through his right kidney and then his liver; it also struck the lower right lung and rested against the eleventh rib on the right. The second bullet entered the victim's left leg and fractured his femur bone. The bullet causing the chest wounds was recovered intact, but only fragments of the bullet from the leg wound were found.

New Orleans Police Officer Kenneth Leary, an expert in ballistics, testified that he examines firearms to determine if particular ammunition was fired from a particular weapon. The officer examined three nine-millimeter cartridge cases provided to him in connection with this matter and concluded that they were all fired from the same nine-millimeter semi-automatic weapon. Officer Leary also examined a nine-millimeter bullet, along with some fragments. One of the fragments, however, did not come from a

nine-millimeter semi-automatic weapon.  One of the fragments had a
bore diameter of thirty-two, which indicated it was fired from a
thirty-two caliber revolver.

New Orleans Police Officer Avery Matthews testified that he
was the first officer to respond to the call concerning the
shooting in the 1800 block of St. Thomas Street.  When he arrived
on the scene, people were in the area and Officer Matthews observed
a man lying face down on the lake side of St. Thomas Street near
St. Mary Street.  Officer Matthews discovered three brass bullet
casings, but no weapon.

New Orleans Police Officer Edwin Worthy testified that he and
his partner, Officer Julio Alonzo, were in the St. Thomas housing
development about 10:30 a.m. on January 11, 1998, investigating the
theft of a chain saw from a parkway crew trimming trees in the
area.  They spoke to people in the area and got a description of a
suspect in the theft.  They noticed Mr. Baker, who was standing
diagonally across the street with several other men.  About 11
a.m., after receiving a call about the shooting, the officers
returned to the scene.  Mr. Baker was no longer present.

Officer Worthy further testified that on January 14, he was
asked by Detective David Gaines to look at a photographic lineup.
Officer Worthy did so, but he did not recognize anyone in the
lineup.  The next day, after viewing a second lineup, Officer
Worthy selected Mr. Baker's picture as being the person he had seen

standing on the corner prior to the murder.

New Orleans Police Officer Julio Alonzo testified to the same facts as Officer Worthy, stating that he too had viewed a photographic lineup on January 14 without selecting anyone. However, like Officer Worthy, Officer Alonzo, the following day, after viewing a second photographic lineup, selected Mr. Baker's picture as being the person he had seen standing on the corner prior to the murder.

Detective David Gaines, the lead investigator in this case, testified that he first went to the hospital to see the victim. The next day he attended the autopsy and he received information about the scene of the crime from the officers who were there. Detective Gaines then prepared a photographic lineup containing the picture of a man named Johnell Brown who was initially considered to be a suspect. He showed this lineup to Officers Worthy and Alonzo and to Sheryl Woods, but none of the three recognized anyone as being connected to the shooting. Detective Gaines then prepared a photographic lineup containing Darrow Baker's picture and, when presented with this second photographic lineup, all three witnesses, Officers Worthy and Alonzo and Ms. Woods, selected Mr. Baker's photograph.

Mr. Robert Zachary Smith, a criminal investigator with the public defender's office, testified that he photographed the site where the murder occurred. He measured from the nearest trees,

9

where he assumed Ms. Woods was standing, to the spot where the gunman was standing, and he found the distance to be one hundred and thirty-one feet.  He also examined the crawl spaces in the nearby buildings and found heavy steel covers over those spaces. Under cross-examination, Mr. Smith admitted he had no expertise in crime scene reconstruction, and also that he did not realize that Ms. Woods had not been standing near the trees, with the tree trimmers, but rather, had been in the street directing traffic. Further, it was established that Mr. Smith's pictures, reflecting heavy steel covers over the crawl spaces of nearby buildings, were taken in 1999, more than a year after the murder, and the pictures depict the opposite side of the street from where the gun was thrown.

## II. STANDARD OF REVIEW

The Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA") includes a comprehensive overhaul of federal habeas corpus legislation, including 28 U.S.C. §2254.  Amended subsections 2254(d)(1) and (2) contain revised standards of review for questions of fact, questions of law and mixed questions of fact and law where there has been an adjudication on the merits in state court proceedings.

State court determinations of questions of law and mixed questions of law and fact are reviewed under 28 U.S.C. §2254(d)(1) and receive deference unless they were "contrary to, or involved an

unreasonable application of clearly established Federal law, as determined by the Supreme Court of the United States."   Hill v. Johnson, 210 F.3d 481, 485 (5th Cir. 2000).   The United States Supreme Court has advised that:

> Under the "contrary to" clause, a federal habeas corpus court may grant the writ if the state court arrives at a conclusion opposite to that reached by this Court on a question of law or if the state court decides a case differently than this Court has on a set of materially indistinguishable facts. Under the "unreasonable application" clause, a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from this Court's decisions but unreasonably applies that principle to the facts of the prisoner's case.

Williams v. Taylor, 529 U.S. 1056, 120 S.Ct. 1495, 1523, 146 L.Ed.2d 389 (2000); Hill, 210 F.3d at 485.   Questions of fact found by the state court are "presumed to be correct ... and we will give deference to the state court's decision unless it `was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.'" Hill, 210 F.3d at 485 (quoting 28 U.S.C.§2254(d)(2)).

## III. ANALYSIS

### A. Insufficiency of Evidence

When conducting a post-AEDPA sufficiency of the evidence review, a federal court may grant relief only if it determines that the state court decision rested on an "unreasonable application" of clearly established Federal law, as determined by the Supreme

Court, to the facts of the case.   See 28 U.S.C. §2254(d)(1).   In its analysis of Baker's insufficiency of evidence claim, the Louisiana Fourth Circuit Court of Appeal first set forth the applicable Supreme Court law and how it related to corresponding Louisiana law, stating:

> The standard for reviewing a claim of insufficient evidence is whether, after viewing the evidence in the light most favorable to the prosecution, a rational trier of fact could have found the essential elements of the offense proven beyond a reasonable doubt.  Jackson v. Virginia, 443 U.S. 307, 99 S.Ct. 2781 (1979); State v. Rosiere, 488 So.2d 965 (La. 1986).  The reviewing court is to consider the record as a whole and not just the evidence most favorable to the prosecution; and, if rational triers of fact could disagree as to the interpretation of the evidence, the rational decision to convict should be upheld.  State v. Mussall, 523 So.2d 1305 (La. 1988).  Additionally, the reviewing court is not called upon to decide whether it believes the witnesses or whether the conviction is contrary to the weight of the evidence.  Id.  The trier of fact's determination of credibility is not to be disturbed on appeal absent an abuse of discretion.  State v. Cashen, 544 So.2d 1268 (La. App. 4 Cir. 1989).

State v. Baker, 800 So.2d 453, No. 2000-KA-1763, pp. 6-7.

The state appellate court then examined the statute and applicable case law describing the crime, second degree murder, for which petitioner was convicted.

> Second degree murder is the killing of a human being when the offender has the specific intent to kill or inflict great bodily harm.  La. R.S. 14:30.1;  State v. Banks, 496 So.2d 1099 (La. App. 4 Cir. 1986).  Specific intent need not be proven as a fact, but may be inferred from the circumstances of the transaction and the actions of the defendant.  State v. Maxie, 93-2158 (La. 4/10/95), 653 So.2d 526.  Specific intent is that state of mind that exists when the circumstances indicate that the

12

> offender actively desired the prescribed criminal consequences to follow from his act or failure to act. La. R.S. 14:10(1); <u>State v. Marshall</u>, 94-1282 (La. App. 4 Cir. 6/29/95), 657 So.2d 1106.

<u>State v. Baker</u>, 800 So.2d 453, No. 2000-KA-1763, p. 7.

Petitioner argues that there was insufficient evidence to support his second degree murder conviction due to the lack of credibility of the lone eyewitness, Sheryl Woods, and the lack of physical evidence linking him to the murder. Petitioner raised this same argument to the Louisiana Fourth Circuit Court of Appeal which set forth the following analysis:

> Mr. Baker first notes that Ms. Woods was the only person on the parkway crew to testify and contends that her testimony is irreconcilable with the physical evidence in the autopsy report. According to this argument, Ms. Woods' testimony that Mr. White was standing directly opposite the gunman is inconsistent with the autopsy report, which showed that the victim's body was pierced from left to right by two bullets. Mr. Baker contends that if Ms. Woods' testimony were accurate, the bullets should have caused frontal body wounds. This argument is not persuasive because it ignores the possibility that Mr. White could have been standing facing the gunman during the argument and then turned to the right to avoid the gunfire, which would have resulted in the bullets entering his left side. Mr. Baker also argues that if the victim and gunman were on opposite sides of the car, a downward angle would be evident in Mr. White's thigh wound, yet the autopsy report indicates a lateral shot parallel to the ground. However, Ms. Woods testified that the two men were on opposite sides of the hood of a small white car during their altercation. Considering this evidence, we find no inconsistency between the autopsy report and the testimony that the gunman shot straight across the top of the hood, hitting the victim's thigh.
> Next, Mr. Baker questions Ms. Woods' motive for testifying, noting her admission that she had received a reward from Crimestoppers. Mr. Baker cites contradictions between the testimony of Ms. Woods and that of Detective Gaines as to when Ms. Woods first learned of the reward. However, this discrepancy does not render Ms. Woods'

entire testimony unreliable, especially since the issue
of when Ms. Woods learned about the reward is not
directly relevant to the guilt or innocence of Mr. Baker.
        Other inconsistencies noted by Mr. Baker include Ms.
Woods' testimony regarding whether or not the gunman had
a beard and whether he had tossed the gun under a
building or into some bushes, and a discrepancy between
her testimony and the police report regarding the color
of the gunman's shoes.  All these inconsistencies were
brought to the attention of the jury, which nevertheless
found Ms. Woods' testimony, along with the other
evidence, to be sufficiently consistent and credible to
support a verdict of second degree murder.  We cannot say
that the jurors abused their discretion in making this
determination.  Mr. Baker was identified by Ms. Woods and
by Officers Worthy and Alonzo as the person they had
spoken to prior to the incident; Ms. Woods warned him
that the police were coming.  He left and when he
returned, she noticed that he was back.  Then she
witnessed his shooting Mr. White, tossing the gun aside,
and walking away.  Considering the totality of the
evidence, the jury did not err in concluding that the
State proved beyond a reasonable doubt that Darrow Baker
committed second degree murder of William White.

State v. Baker, 800 So.2d 453, No. 2000-KA-1763, pp. 7-9.

Petitioner, in an attempt to further discredit Ms. Woods'
credibility, points to other alleged weaknesses in her testimony,
such as her testimony to the effect that "little pebbles" were in
the victim's hand, yet an autopsy disclosed no trace of "crack
cocaine" on either of the victim's hands, along with her alleged
inability to describe "the make, model or ... size" of the vehicle
in which the victim was a passenger and inability to describe the
group of men who were originally with petitioner when Woods first
confronted the group in connection with the stolen chain saw. [6]
However, as the state appellate court noted, inconsistencies in Ms.

---

[6]See Federal rec., doc. 1, petitioner's "Brief in Support of
Petition for Writ of Habeas Corpus Filed Pursuant to 28 U.S.C.
§§2241, 2254" at pp. 7-8.

Woods' testimony were brought to the attention of the jury which, nevertheless, determined petitioner to be guilty of second degree murder.

Petitioner, in support of his insufficient evidence claim, also points to alleged inconsistencies in the testimony of Dr. Hunt and Officer Leary.[7]  However, as the Louisiana Fourth Circuit noted, petitioner was identified by Ms. Woods, along with Officers Worthy and Alonzo, as the person they had spoken to in connection with the missing chain saw.  Then, after having spoken with him, Ms. Woods specifically noted that petitioner had returned to the area, then witnessed him shoot the victim.  Ms. Woods was provided two sets of six-photo lineups and identified petitioner as the shooter.[8]  The following colloquy took place on direct examination with respect to Ms. Woods' view of the shooter:

> Q.  When you were out on the street that day, did you have a clear view of who did this?
> A.  Yes, sir.
> Q.  Was the lighting good that day?
> A.  It was perfect, a pretty day.[9]

Ms. Woods' direct examination ended with the following exchange:

> Q.  Ma'am, who killed William White?
> A.  Darrow Baker.[10]

---

[7]See Federal rec., doc. 1, petitioner's "Brief in Support of Petition for Writ of Habeas Corpus Filed Pursuant to 28 U.S.C. §§2241, 2254" at p. 8.

[8]See State rec., vol. 1 of 4, trial transcript at pp. 106-108.

[9]See State rec., vol. 1 of 4, trial transcript at p. 109.

[10]See State rec., vol. 1 of 4, trial transcript at p. 111.

Based upon the above, it is clear that the state court properly examined the elements necessary to prove second degree murder, and determined, examining the evidence in a light most favorable to the prosecution, that the elements had been proven. Accordingly, the court finds that the Louisiana Fourth Circuit Court of Appeal did not unreasonably apply the applicable law enunciated by the Supreme Court in Jackson, supra. Furthermore, the court agrees with the findings of the state court on this issue.

**B.   Unconstitutional Method Employed to Choose Grand Jury Foreperson**

Petitioner claims that the procedure, set forth under La.C.Cr.P. art. 413(C),[11] used to select the foreperson of the grand jury which indicted him, was unconstitutional.[12]   In its Response,

---

[11]At both the time he was indicted and convicted, LSA-C.Cr.P. art. 413(C) provided that "[i]n the parish of Orleans, the court shall select twelve persons plus a first and second alternate for a total of fourteen persons from the grand jury venire, who shall constitute the grand jury.  The court shall thereupon select one of the jurors to serve as foreman."   La.C.Cr.P. art. 413(C)was repealed by the state legislature in 2001.

[12]In addition to claiming that Article 413(C) violated his rights under the United States Constitution, petitioner argues that the pertinent provisions were also violative of his rights under the Louisiana Constitution.   Petitioner's argument in this regard is based upon the Louisiana Supreme Court's opinion in State v. DiLosa, 848 So.2d 546, 551 (La. 2003), wherein the court deemed that Article 413(C) violated Article III, Section 12(A) of the Louisiana Constitution which prohibits the legislature from passing local laws "[c]oncerning any ... criminal actions, including ... regulating the practice or jurisdiction of any court...."   However, as this court noted in the Report and Recommendation (rec. doc. # 28) issued in Varnado v. Cain, Civil Action 02-1286 c/w 03-753 and 03-754 (E.D. La. 2004), "Dilosa affords [petitioner] no solace

the State correctly notes that, pursuant to Louisiana law, a claim challenging the manner of selection of the grand juries and their forepersons is waived if not asserted in a pretrial motion to quash.   See La. C.Cr.P. 533(1) and 535(D); State v. Richthofen, 803 So.2d 171, 194 (La. App. 5th Cir. 2001); Williams v. Cain, 125 F.3d 269, 274 (5th Cir. 1997).   No pretrial motion to quash the indictment was filed in petitioner's case on the grounds now asserted by petitioner.

When the last state court to consider a petitioner's federal claim disposed of that claim on either a substantive or procedural state law that is independent of the federal question involved and adequate to support the judgment, review of the claim is procedurally barred in federal court.   Finley v. Johnson, 243 F.3d 215, 218 (5th Cir. 2001).   In its Response, the State recognizes that the state courts did not expressly rely on the above state procedural bar in disposing of the instant claim, but nevertheless asserts it as a defense.[13]   Therefore, this court must decide whether the State is entitled to raise that defense in this proceeding.

_____

because it is axiomatic that federal habeas relief may be granted only to remedy violations of the Constitution and laws of the United States; mere violations of state law will not suffice."   28 U.S.C. §2254(a); Engle v. Issac, 456 U.S. 107, 102 S.Ct. 1558, 71 L.Ed.2d 783 (1982); Bailey v. Procunier, 744 F.2d 1166, 1168 (5th Cir. 1984).

[13]See Federal rec., doc. 11, State's Response at pp. 11-12.

The applicability of the procedural bar doctrine is often simple because the state court clearly and expressly rejects the claim by referencing a state procedural rule.  In the instant case, however, not one of three state courts which considered petitioner's claim regarding the grand jury bothered to assign any reason whatsoever in denying said claim.  The state district court issued a Judgment providing:  "Application for Post Conviction relief is DENIED."[14]  The Louisiana Fourth Circuit Court of Appeal simply stated that it found "no error in the judgment of the district court denying relator's application for post conviction relief."[15]  Finally, the Louisiana Supreme Court cryptically denied the related writ application without assigning reasons.  See State ex rel. Baker v. State, 904 So.2d 738 (La. 2005).  Accordingly, the question is whether this court may still find that the state courts nevertheless decided petitioner's claim based on a state procedural rule so as to bar federal review of that claim.

Initially there was some confusion over this issue arising from the decision in Harris v. Reed, 489 U.S. 255, 109 S.Ct. 1038, 103 L.Ed.2d 308 (1989), in which the United States Supreme Court held that "a procedural default does not bar consideration of a federal claim on either direct or habeas review unless the last

---

[14]A copy of the district court's Judgment is contained in the State rec., vol. 3 of 4.

[15]A copy of the state appellate court's decision is contained in the State rec., vol. 3 of 4.

state court rendering a judgment in the case clearly and expressly states that its judgment rests on a state procedural bar." Id., 489 U.S. at 263, 109 S.Ct. at 1043 (internal quotation marks omitted). However, in Coleman v. Thompson, 501 U.S. 722, 111 S.Ct. 2546, 115 L.Ed.2d 640 (1991), the United States Supreme Court clarified that ruling, holding that a clear and express statement that a state procedural bar is being applied is required only if it fairly appears that the last state court addressing the claim rested primarily on federal law or was interwoven with federal law. Id., 501 U.S. at 735-40, 111 S.Ct. at 2557-59. However, if the state court decision makes no mention of federal law and it fairly appears that the decision rested primarily on state law, the federal procedural bar applies even in the absence of a clear and express invocation by the state court of the state procedural bar. Id., 501 U.S. at 740, 111 S.Ct. at 2559. The United States Fifth Circuit Court of Appeals has noted and followed the holding in Coleman. See, e.g., Hoque v. Johnson, 131 F.3d 466, 492-98 (5th Cir. 1997); Young v. Herring, 938 F.2d 543 (5th Cir. 1991). Accordingly, the fact that the state courts denied petitioner's grand jury claim without explanation does not, in and of itself, mean that the claim is not procedurally barred in this federal proceeding.

In this case, the state courts made no reference whatsoever to federal law in rejecting petitioner's grand jury claim. Moreover,

it fairly appears that the state court decisions rested primarily on the state procedural rule that challenges to the grand jury are waived unless presented in a pretrial motion to quash.   For example, the claim presented by petitioner is a complex one which, if decided on the merits, would have required thorough examination of the evidence regarding the composition and selection of the grand jury and its foreperson.   However, the state district court rejected petitioner's claims in a one-sentence Judgment.   There is no indication whatsoever that the state district court, or the appellate courts, considered petitioner's evidence regarding his claim or decided the claim on the merits.   Under these circumstances, the court finds that the only logical conclusion is that the state courts based their decision on the state procedural rule.

The United States Fifth Circuit Court of Appeal has clearly provided that the requirement under Louisiana law that a defendant file a pretrial motion to quash "provides an 'adequate and independent' state law ground" for denying a constitutional challenge to the grand jury composition.   Williams v. Cain, 125 F.3d 269, 276 (5th Cir. 1997).   As such, federal habeas review is barred absent a showing of both "cause" for the default and "prejudice attributed thereto", or a demonstration that the federal court's failure to review the defaulted claim will result in a "fundamental miscarriage of justice."   Amos v. Scott, 61 F.3d 333,

338-39 (5th Cir.), <u>cert. denied</u>, 516 U.S. 1005, 116 S.Ct. 557, 133 L.Ed.2d 458 (1995); <u>Wainwright v. Sykes</u>, 433 U.S. 72, 97 S.Ct. 2497, 53 L.Ed.2d 594 (1977); <u>Harris v. Reed</u>, 489 U.S. 255, 262, 109 S.Ct. 1038, 1043, 103 L.Ed.2d 308 (1989); <u>Engle v. Isaac</u>, 456 U.S. 107, 129, 102 S.Ct. 1558, 1572, 71 L.Ed. 783 (1982).

In the instant matter, petitioner has not demonstrated the requisite cause and prejudice, as such, the instant claim is procedurally barred unless he can show that a fundamental miscarriage of justice would result. In order to establish a "fundamental miscarriage of justice," a petitioner must "make a persuasive showing that he is actually innocent of the charges against him. Essentially, the petitioner must show that, as a factual matter, he did not commit the crime for which he was convicted." <u>Finley v. Johnson</u>, 243 F.3d 215, 220 (5th Cir. 2001) (citations omitted). Petitioner, in this instance, has made no such showing. Accordingly, the instant claim is subject to dismissal.

### C. Denial of Right to Testify

Petitioner contends that defense counsel unconstitutionally denied him his right to testify at trial. According to petitioner, during each trial recess, he advised counsel that he wanted to testify. Counsel, however, "forc[ed] him to remain silent", warning petitioner that if he testified, "his criminal past would be exposed and the jury would find him guilty based on that fact

alone".[16]

"A criminal defendant has a constitutional right to testify in his own behalf; it is an aspect of his right to defend himself, a right held in <u>Rock v. Arkansas</u>, 483 U.S. 44, 51-53, 107 S.Ct. 2704, 2709-10, 97 L.Ed.2d 37 (1987), to be implicit in the Fifth, Sixth and Fourteenth Amendments." <u>Underwood v. Clark</u>, 939 F.2d 473, 475 (7th Cir. 1991) (citations omitted); <u>see also</u> <u>White v. Cain</u>, 2006 WL 3703240, *4 (E.D. La. 2006).  A habeas petitioner, however, has the burden of proving that he was denied this constitutional right. As the court explained in <u>Turcios v. Dretke</u>, 2005 WL 3263918, *6 (S.D.Tex. 2005), "a petitioner in a habeas proceeding cannot prevail on such a claim merely by stating to the habeas court that he told his trial attorney that he wished to testify and that his attorney forbade him from taking the witness stand.  <u>Underwood v. Clark</u>, 939 F.2d 473, 475-76 (7th Cir. 1991)."  The <u>Underwood</u> court specifically noted the potential problem posed if a habeas petitioner, arguing that counsel unconstitutionally denied him his right to testify, is not required to satisfy his burden of proof.

> There is grave practical difficulty in establishing a mechanism that will protect a criminal defendant's personal right (that is, a right not waivable by counsel) to testify on his own behalf without rendering the criminal process unworkable.  It is extremely common for criminal defendants not to testify, and there are good reasons for this, as we have seen. Yet it is simple

---

[16]<u>See</u> Fed. rec., doc. 1, petitioner's "Brief in Support of Petition for Writ of Habeas Corpus Filed Pursuant to 28 U.S.C. §§ 2241, 2254" at p. 23.

enough after being convicted for the defendant to say,
"My lawyer wouldn't let me testify. Therefore I'm
entitled to a new trial." That's what Underwood did.
His affidavit, which is the only evidence bearing on the
question, states, so far as pertinent here, "I was denied
the opportunity to testify at my own trial in that I told
my attorney that I wished to testify on my own behalf.
My attorney told me I could not testify.

We agree with the First Circuit's ruling in
<u>Siciliano v. Vose</u>, 834 F.2d 29, 31 (1st Cir. 1987), that
this barebones assertion by a defendant, albeit made
under oath, is insufficient to require a hearing or other
action on his claim that his right to testify in his own
defense was denied him. It just is too facile a tactic
to be allowed to succeed. Some greater particularity is
necessary-and also we think some substantiation is
necessary, such as an affidavit from the lawyer who
allegedly forbade his client to testify-to give the claim
sufficient credibility to warrant a further investment of
judicial resources in determining the truth of the
claim.[17]

<u>Underwood</u>, 939 F.2d at 475-76 (footnoted added).

In the instant matter, there is no evidence to prove
petitioner's claim other than his statement to the effect that
trial counsel denied him his constitutional right to offer
testimony at trial. "Standing alone, such self-serving statements
cannot be allowed to succeed or the criminal judicial process would
become unworkable." <u>Turcios</u>, 2006 WL at *6, <u>citing</u> <u>Underwood</u>, 939
F.2d at 475-76. Accordingly, the court finds that petitioner has
failed to meet his burden to establish that he is entitled to

---

[17]In the instant matter, petitioner represents that his trial
counsel has refused to provide him with an affidavit supporting his
allegations that counsel would not allow him to testify on his own
behalf. <u>See</u> Federal rec., doc. 1, petitioner's "Brief in Support
of Petition for Writ of Habeas Corpus Filed Pursuant to 28 U.S.C.
§§2241, 2254" at p. 25.

habeas corpus relief.

Additionally, while petitioner has not couched his claim in terms of ineffective assistance of counsel, the Fifth Circuit has provided "that where the defendant contends that his counsel interfered with his right to testify, the 'appropriate vehicle for such claims is a claim of ineffective assistance of counsel.'" U.S. v. Mullins, 315 F.3d 449, 452 (5th Cir. 2002), cert. denied, 541 U.S. 1031, 124 S.Ct. 2096, 158 L.Ed.2d 713 (2004), quoting Sayre v. Anderson, 238 F.3d 631, 634 (5th Cir. 2001) (quotation omitted).  The seminal case for adjudicating a habeas petitioner's ineffective assistance of counsel claim is Strickland v. Washington, 466 U.S. 668, 697, 104 S.Ct. 2052, 2069, 80 L.Ed.2d 674 (1984), which places on petitioner the burden of demonstrating not only that his counsel's performance was deficient, but also that he was prejudiced as a result of counsel's deficient performance.  If a court finds that a petitioner has made an insufficient showing as to either one of the two prongs of inquiry, it may dispose of the claim without addressing the other prong.  Id.

Under the deficient performance prong of the Strickland test, "... it is necessary to 'judge...counsel's challenged conduct on the facts of the particular case, viewed as of the time of counsel's conduct.'" Lockhart v. Fretwell, 506 U.S. 364, 371, 113 S.Ct. 838, 844, 122 L.Ed.2d 180 (1993),quoting Strickland, 466 U.S. at 690, 104 S.Ct. at 2066.  A counsel's decision regarding whether to place a criminal defendant on the witness stand "is a 'judgment call' which

should not easily be condemned with the benefit of hindsight." United States v. Garcia, 762 F.2d 1222, 1226 (5th Cir. 1985).   "'An attorney's performance, which enjoys a strong presumption of adequacy, is deficient if it is objectively unreasonable." United States v. Walker, 68 F.3d 931, 934 (5th Cir. 1995), cert. denied, 516 U.S. 1165, 116 S.Ct. 1056, 134 L.Ed.2d 201 (1996), quoting United States v. Acklen, 47 F.3d 739, 742 (5th Cir. 1995), cert. denied, 519 U.S. 1142, 117 S.Ct. 1017, 136 L.Ed.2d 893 (1997).   To prove prejudice under the Strickland standard, a petitioner "... must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Strickland, 466 U.S. at 694, 104 S.Ct. at 2068.

Petitioner asserts that if counsel would have allowed him to testify, he would have informed jurors that at the time of the shooting, the victim was "in possession of a firearm which the 'people in the neighborhood' removed before the police arrived". According to petitioner, his testimony in this regard would have proven "more reasonable than ever" that the victim "fired the .32 caliber bullet that struck [the victim] in the leg, while attempting to kill the petitioner."[18]  Further, his testimony would have carried "just as much weight" as the "conflicting and contradictory testimony presented by the [S]tate['s] witness,

---

[18]See Federal rec., doc. 1, petitioner's "Brief in Support of Petition for Writ of Habeas Corpus Filed Pursuant to 28 U.S.C. §§2241, 2254" at p. 18.

Sheryl Woods ... who's [sic] motive for testifying was the Crimestoppers reward."[19]

The above assertion is problematic in several respects. First, the evidence is far from clear regarding whether a .32 caliber bullet struck the victim in the leg or was even associated with the crime at issue. The .32 caliber bullet or, more specifically, bullet fragment, was part of State's Exhibit Four which consisted of three bullet fragments allegedly extracted from the victim's leg. However, Dr. Alvaro Hunt, the physician who performed the autopsy, testified that he "only recovered two torn fragments of bullet" from the victim's left leg.[20] When Dr. Hunt was asked to describe State's Exhibit Four, the following colloquy ensued:

> A. [T]his is the envelope that I prepared which contained two bullet fragments which were in the inner aspect of the left leg.
> Q. Could you take the fragments out of there?  Now, how many fragments do you actually end up with?
> A. Well, there are three fragments in this envelope.
> Q. How many did you take out of the body and how many did you put in there?
> A. I put two fragments in here as described on my envelope and also as described in the autopsy protocol.
> Q. Do you know where the third bullet fragment came from?
> A. I have no idea.[21]

Similarly, the ballistics expert, Officer Kenneth Leary,

---

[19]See Federal rec., doc. 1, petitioner's "Brief in Support of Petition for Writ of Habeas Corpus Filed Pursuant to 28 U.S.C. §§2241, 2254" at pp. 18-19.

[20]See State rec., vol. 1 of 4, trial transcript at pp. 11-12.

[21]See State rec., vol. 1 of 4, trial transcript at pp. 12-13.

informed that he had no information regarding where the evidence comprising State's Exhibit Four came from, stating: "[I]t was received in this envelope with the rest of the evidence from the coroner's office."[22] On cross-examination, in response to defense counsel's leading question that the bullet fragments comprising State's Exhibit Four came from the autopsy, Officer Leary responded that he "didn't recover them [i.e., the bullet fragments]." He informed that "[t]hey were picked up by ou[r] evidence technician from central evidence and property and transported to the crime lab where I was assigned this particular case."[23] Further, when defense counsel insinuated that perhaps Officer Leary, by virtue of his testimony, was suggesting that State's Exhibit Four was "tampered with", that perhaps the .32 caliber bullet fragment comprising a portion of the exhibit was simply "found on the stretcher at the hospital," Officer Leary responded: "Other than the evidence being in the envelope when I received it, I cannot tell you where it came from."[24]

Second, petitioner's alleged testimony to the effect that there were two guns at the crime scene, that both he and the victim possessed a gun, would not have been in direct contrast with Sheryl Woods' testimony. Woods stated on cross-examination that she never actually saw any shots being fired and she did not know how many

---

[22]See State rec., vol. 1 of 4, trial transcript at p. 27.

[23]See State rec., vol. 1 of 4, trial transcript at p. 29.

[24]See State rec., vol. 1 of 4, trial transcript at pp. 29-30.

guns were involved in the shooting.[25]  However, this testimony would have removed all doubt as to the accuracy of Woods' identification of defendant as being involved in the death of White.

According to defendant, he would have testified that he and White argued over money and that White had a weapon with which he threatened to kill defendant.  Darrow then advised that he would have further testified that he fired at White in self defense when White pulled a gun out of his waistband.  Defendant, therefore, argues that White's death was justifiable homicide.  The Court notes that this argument is completely inconsistent with the argument made as to the sufficiency of the evidence where Darrow attacked the accuracy of Ms. Woods' identification of him.[26]

Third, the damage, if any, to Woods' credibility based upon the fact that she received a $1000 Crimestoppers reward was minimal.  As reflected below, during both her direct and cross examinations it was established that Woods had already offered testimony before a grand jury which had resulted in petitioner's indictment before she ever learned about the Crimestoppers reward.

> DIRECT EXAMINATION:
> Q.  Now, at some point, did Detective Gaines talk to you about getting some money from Crimestoppers?
> A.  After I had gone before the grand jury, yes, he did mention it to me because I didn't know anything about – well, I knew of the Crimestoppers commercials but I had never thought about calling Crimestoppers for anything. I mean, there was already an indictment and he told me that I was entitled to it.  It didn't phase me one way or

---

[25]See State rec., vol. 1 of 4, trial transcript at pp. 138-139.

[26]See Federal Rec., doc. 1, petitioner's "Brief in Support of Petition for Writ of Habeas Corpus" at p. 18.

the other.  I didn't go to Crimestoppers because I wasn't doing any of this for a dollar.[27]

CROSS EXAMINATION:
Q.  Did she [a girlfriend] tell you about this part right here I'm highlighting, the thousand bucks?
A.  No, I had already given testimony before I knew about the thousand bucks.[28]

The above-described problems with the testimony which allegedly would have been presented to the jury had petitioner taken the witness stand, coupled with the fact that jurors, as a result of petitioner's testimony, would have been informed of his criminal history, leads this court to conclude that counsel's decision not to place petitioner on the witness stand rendered his performance neither deficient nor prejudicial.  Accordingly, petitioner is not entitled to habeas corpus relief.

Petitioner, in his supporting memorandum, also suggests that counsel was ineffective due to his failure to interview potential witnesses, "especially the ones who Woods claims to have been in the company of" at the time of the shooting.[29]  However, "complaints of uncalled witnesses are not favored in federal habeas corpus review because allegations of what the witness would have testified are largely speculative."  Evans v. Cockrell, 285 F.3d 370, 377 (5th Cir. 2002), citing Sayre v. Anderson, 238 F.3d 631, 635-36

---

[27]See State rec., vol. 1 of 4, trial transcript at pp. 108-109.

[28]See State rec., vol. 1 of 4, trial transcript at p. 115.

[29]See Federal rec., doc. 1, petitioner's "Brief in Support of Petition for Writ of Habeas Corpus Filed Pursuant to 28 U.S.C. §§2241, 2254" at p. 18.

(5th Cir. 2001).   To show the prejudice required to support an ineffective assistance of counsel claim premised on the failure to call a witness, a petitioner "'must show not only that [the] testimony would have been favorable, but also that the witness would have testified at trial.'"   Evans, 285 F.3d at 377, quoting Alexander v. McCotter, 775 F.2d 595, 602 (5th Cir. 1985). Petitioner has failed to satisfy his burden of proof in this regard.   Accordingly, his claim for habeas relief is without merit.

### D.   Improper "Reasonable Doubt" Jury Instruction

Petitioner claims that the trial court erred in failing to instruct the jury that a reasonable doubt as to petitioner's guilt could arise out of a lack of evidence.   Petitioner's claim is based on La.C.Cr.P. art. 804 which provides, in pertinent part:

A.   In all cases the court shall charge the jury that:

(2)   It is the duty of the jury, in considering the evidence and applying to that evidence the law as given by the court, to give the defendant the benefit of every reasonable doubt arising out of the evidence or out of the lack of evidence in the case....

It is well established that even if a jury charge is defective under state law, that alone does not warrant relief in a federal habeas corpus proceeding.   Such relief may be granted only to remedy violations of the Constitution and laws of the United States; mere violations of state law will not suffice.  28 U.S.C. §2254; Engle v. Isaac, 456 U.S. 107, 119, 102 S.Ct. 1558, 1567, 71 L.Ed.2d 783 (1982).

Further, under Louisiana law, a defendant must lodge a

contemporaneous objection to a jury charge in order to preserve his right to challenge it. La.C.Cr.P.art. 801(C) provides, in pertinent part: "A party may not assign as error the giving or failure to give a jury charge or any portion thereof unless an objection thereto is made before the jury retires or within such time as the court may reasonably cure the alleged error." As the State notes in its Response, petitioner lodged no objection to any of the trial court's instructions to the jury.[30]

As this court noted earlier, when the last state court to consider a petitioner's federal claim disposed of that claim on either a substantive or procedural state law that is independent of the federal question involved and adequate to support the judgment, review of the claim is procedurally barred in federal court. Finley, 243 F.3d at 218. In this instance, none of the state courts expressly relied on the above state procedural rule in disposing of the instant claim. Accordingly, this court must ascertain whether the State's assertion, that petitioner has waived his challenge to the trial court's jury charge by virtue of his failure to raise a contemporaneous objection, is correct.

Once again, the applicability of the procedural bar doctrine

_____

[30]See Federal rec., doc. 11, State's Response at p. 14; see also State rec., vol. 1 of 4, trial transcript at p. 175. While the trial transcript reflects that no objections to the jury charges were lodged, a transcription of the jury charges themselves was not prepared or, at least, was not included in the State court record provided to this court in connection with the instant federal habeas corpus application.

is often simple because the state court clearly and expressly rejects the claim by referencing the pertinent state procedural rule, in this case, the contemporaneous objection rule.   However, not one of the three state courts which considered the instant claim in connection with petitioner's post-conviction application, assigned any reasons in denying his application.   The state appellate and supreme courts, without assigning reasons, endorsed the district court's decision which provided:   "Application for Post Conviction relief is DENIED."[31]   Thus, the issue to be decided, for purposes of determining whether or not federal habeas review is barred, is:   Did the state courts implicitly decide petitioner's claim on a state procedural rule or did they address the merits?[32] An examination of Winfield v. Cain, 1999 WL 436597 (E.D. La. 1999), and its associated cases, will assist in the resolution of this issue.

In Winfield, supra, one of the habeas petitioner's claims was that the trial court gave an improper jury instruction regarding "reasonable doubt".   The Winfield court, though "unable to locate these jury instructions in the record", reasoned:

---

[31]A copy of the district court's Judgment is contained in the State rec., vol. 3 of 4.

[32]As was discussed supra at p. 19, in Coleman, supra, the United States Supreme Court determined that for purposes of barring federal habeas corpus review, a clear and express statement that a state procedural bar is being applied is required only if it fairly appears that the last state court addressed the merits of the federal claim.

> However, even assuming that Petitioner's recitation of
> [the] definition of "reasonable doubt" given by the
> trial judge is correct, the Petitioner's arguments must
> fail. The record is clear that the Petitioner did not
> object to the court's jury instruction.
>
> It is well settled that the "contemporaneous
> objection" rule is an additional "independent and
> adequate" state procedural ground which bars habeas
> review. <u>Wainwright v. Sykes</u>, 433 U.S. 72, 87-88, 97
> S.Ct. 2497, 2506-07, 53 L.Ed.2d 594 (1977).

<u>Winfield v. Cain</u>, 1999 WL 436597, *5-6 (E.D. La. 1999).  The

Fifth Circuit, however, reversed, based upon its finding that the

state appellate court, by virtue of its decision providing "'that

[t]he claims raised by [Winfield] in his application for post

conviction relief are <u>without merit</u>,' was a determination on <u>the</u>

<u>merits</u> as opposed to a finding of procedural default, <u>Winfield v.</u>

<u>Cain</u>, (unpublished opinion) No. 99-30834 (5th Cir. Jan. 15,

2001), p. 6 (emphasis added)...."  <u>Winfield v. Cain</u>, 2002 WL

272385, *1 (E.D. La. 2002).

In contrast with the situation in <u>Winfield</u>, none of the

state courts who considered the instant claim made any reference

to having considered the merits of said claim.  Instead, the

district court, as noted earlier, simply wrote:  "Application for

Post Conviction Relief is DENIED"; the state appellate court

wrote:  "**<u>WRIT DENIED</u>**.  This court finds no error in the judgment

of the district court denying relator's application for post-

conviction relief"; and the state supreme court issued a one-word

decision, "Denied".  Accordingly, there is no indication

whatsoever that the pertinent state courts considered the merits of the instant claim.  The court, therefore, finds that the only logical conclusion is that the state courts based their decision on the state contemporaneous objection rule.

It is well-established that the contemporaneous-objection rule is an independent and adequate state procedural ground.  <u>See Wainwright</u>, 433 U.S. at 87-88, 97 S.Ct. at 2506-07.  As such, federal habeas review is barred absent a showing of "cause" and "prejudice".[33]

In the matter at hand, petitioner has not demonstrated the required "cause" and "prejudice".  Accordingly, his jury charge claim is barred unless he can show that a "fundamental miscarriage of justice" would result absent this court's review.[34]  Petitioner has failed to make the requisite "actual innocence" showing.  As such, the instant claim is subject to dismissal.

### E.  Denial of Right to Present a Defense/Ineffective Assistance of Counsel

In this claim, petitioner argues that he was denied the right to present a defense and counsel was ineffective by virtue of the fact that members, other than Ms. Woods, of the New

---

[33]<u>See</u> discussion <u>supra</u> at p. 21.

[34]<u>See</u> discussion <u>supra</u> at p. 21.

34

Orleans Parks and Parkway Department crew who were on the scene at the time of the shooting, were not interviewed and presented as witnesses at trial.  Petitioner also complains that potential witness, Johnell Brown, was not interviewed.  According to petitioner, Mr. Brown would have testified that petitioner and William White, the victim, "had a 'heated' argument", and that White "had a weapon which was removed ... by people in the neighborhood before the police arrived."  By virtue of counsel's failure to interview these persons and call them as trial witnesses, petitioner contends that defense counsel "abandoned" him, failing to set forth his only "plausible line of defense", namely, that petitioner shot White in self-defense.[35]

As stated earlier, to satisfy his burden of proving ineffective assistance of counsel, petitioner must show not only that counsel was deficient, but also that he was prejudiced as a result of counsel's deficient performance.  <u>Strickland</u>, 466 U.S. at 697, 104 S.Ct. at 2069.  Further, as the court noted earlier, claims that counsel was ineffective by virtue of his or her failure to call a witness to testify at trial are generally "not favored in federal habeas corpus review because allegations of what the witness would have testified are largely speculative."  <u>Evans</u>, 285 F.3d at 377, <u>citing</u> <u>Sayre</u>, 238 F.3d 635-36.  To make

---

[35]<u>See</u> Federal rec., doc. 14, petitioner's "Traverse to State's Response to Habeas Corpus Petition" at p. 12.

the required prejudice showing, a petitioner "'must show not only that [the] testimony would have been favorable, but also that the witness would have testified at trial.'" <u>Evans</u>, 285 F.3d at 377, <u>quoting</u> <u>Alexander</u>, 775 F.2d at 602.

A review of the transcript of petitioner's motion to suppress hearing, particularly, the testimony of New Orleans Police Detective David Gaines, reflects that despite the fact that there were several persons, including fellow members of the New Orleans Park and Parkways Department crew, around the area at the time of the shooting, Sheryl Woods was the only one who actually witnessed the shooting.  On cross-examination, the following exchange took place:

> Q.  Did you show these lineup photos to any of the other people that were on the - - was it a Park and Parkways crew - -
>
> A.  Yes.
>
> Q.  - -  that was working out there?
>
> A.  Did I show it?  No, I did not.
>
> Q.  You didn't show any of the other individuals that work with Ms. Woods the photo lineup?
>
> A.  No.
>
> Q.  Did you have any other bystanders, anyone else that might have seen something that you showed the lineup to?
>
> A.  Ah, I had no one else that indicated that they had witnessed the shooting.  **There were other people present, but, ah, for different reasons, they did not witness the shooting.**  [Emphasis added.][36]

---

[36]<u>See</u> State rec., vol. 1 of 4, transcript of August 21, 1998 motion hearing at p. 8.

As for Johnell Brown, not only is there no evidence that he witnessed the shooting, there is no evidence reflecting that he was even in the area during or shortly before the time the shooting took place.  At trial, on direct examination, Detective Gaines offered the following testimony:

> Q.  [P]ursuant to your investigation, did you eventually develop a suspect by the name of Johnell Brown?
>
> A.  Yes, I did.
>
> Q.  And did you compile a photo lineup with Mr. Brown in it?
>
> A.  Yes, I did.
>
> Q.  I will show you what's been previously marked as State's exhibit Number Eight.  Is this that lineup?
>
> A.  Yes, it is.
>
> Q.  Did you have the occasion to show that lineup to Officers Worthy and Alonzo?
>
> A.  I did.
>
> Q.  Now, were they on the scene of the murder?
>
> A.  No, they were not.
>
> Q.  So, why were you showing this lineup of Johnell Brown?
>
> A.  Prior to the murder occurring, there was a report of a stolen chain saw from a crew that was working in the area, trimming trees.  Officers Worthy and Alonzo conducted the investigation concerning the chain saw. They went to the scene and interviewed several persons there and then departed.[37]
>
> Q.  What is the connection between them interviewing people with the chain saw and the murder?
>
> A.  I was trying to determine if they could identify

---

[37]Detective Gaines subsequently testified that Officers Worthy and Alonzo, in connection with their investigation of the stolen chain saw, were at the scene within an hour of the time the murder took place.  See State rec., vol. 1 of 4, trial transcript at p. 68.

anyone on the scene to see if a certain person was on the scene.  The perpetrator of this homicide was on the scene at the time that they were there.

Q.  And did they identify anyone in that photographic [lineup]?

A.  No, they did not.  [Footnote added.][38]

Similarly, Ms. Woods, upon being shown the photographic lineup containing Johnell Brown's picture, "could not identify anyone".[39]

Based upon the above, the court finds that petitioner has failed to satisfy his burden of showing that other alleged persons on the scene at the time of the shooting, in particular members of the pertinent New Orleans Parks and Parkway Department crew and initial murder suspect, Johnell Brown, would have testified at trial and that their testimony would have been favorable.  Accordingly, petitioner is not entitled to habeas corpus relief.

## **RECOMMENDATION**

It is therefore RECOMMENDED that the petition of Darrow

---

[38]See State rec., vol. 1 of 4, trial transcript at pp. 65-67.  In contrast, when shown a second photographic lineup containing petitioner's picture, each officer, individually, "identified Darrow Baker as being on the scene at the time they conducted their investigation."  See trial transcript at pp. 67-68.

[39]See State rec, vol. 1 of 4, trial transcript at p. 69.  In contrast, Ms. Woods, upon viewing the photographic lineup containing petitioner's picture, was able to "make an identification".  See trial transcript at p. 69.

Baker for habeas corpus relief be DENIED WITH PREJUDICE.

A party's failure to file written objections to the proposed findings, conclusions, and recommendation in a magistrate judge's report and recommendation within 10 days after being served with a copy shall bar that party, except upon grounds of plain error, from attacking on appeal the unobjected-to proposed factual findings and legal conclusions accepted by the district court, provided that the party has been served with notice that such consequences will result from a failure to object.  <u>Douglass v. United Services Auto. Ass'n</u>, 79 F.3d 1415, 1430 (5th Cir. 1996).

New Orleans, Louisiana, this <u>19th</u> day of <u>    June    </u>, 2007.


_____
ALMA L. CHASEZ
United States Magistrate Judge